IN the INTEREST OF J.L.W., a person under the age of 18:
MRS. R., Appellant,

v.

Mr. and Mrs. B., Respondents.†

Supreme Court

*No. 80–2191.   Argued April 1, 1981.—Decided June 2, 1981.*

(Also reported in 306 N.W.2d 46.)

† Motion for reconsideration denied, without costs, on July 6, 1981.

For the appellant there was a brief by *Kenneth J. Murray, Richard D. Moake, Laurie A. Eggert* and *Murray & Moake, S.C.,* of Milwaukee, and oral argument by *Kenneth J. Murray* and *Richard Moake.*

For the respondents there was a brief by *Patrick Schmidt, William E. Fisher, Joan P. Clark* and *Quarles & Brady* of Milwaukee, and oral argument by *Mr. Schmidt.*

DAY, J.   This is an appeal from an order and judgment of the circuit court for Milwaukee county, permanently terminating the parental rights of Mrs. R. to her son J.L.W. The primary question is: May the parental rights of Mrs. R. be terminated without a finding that she is an unfit parent? We hold that termination of her parental rights, without a finding of unfitness, constituted a denial of her fundamental rights, protected by the due process clause of the Fourteenth Amendment to the United States Constitution and article I, sec. 1 of the Wisconsin Constitution. Other issues on appeal will be discussed later in the opinion.

This case commenced on May 22, 1980, when the respondents (Mr. and Mrs. B.) filed a petition for guard-

ianship and a petition for temporary guardianship over the person of J.L.W., a minor, pursuant to secs. 48.14,[1] 880.03[2] and 880.15,[3] Stats. 1977. Both petitions alleged

[1] "48.14. **Jurisdiction over other matters relating to children.** The court has exclusive jurisdiction: . . . (2) The appointment and removal of a guardian of the person in the following cases:

"(a) For a minor, where parental rights have been terminated under ss. 48.40 to 48.43; or

"(b) The appointment and removal of a guardian of the person for a child under ss. 48.43 and 48.85 and ch. 880 and for a child found to be in need of protection or services under s. 48.13 because the child is without parent or guardian." (See amendments enacted as Chs. 32, 300 and 330, Laws of 1979.)

[2] "880.03. **Persons and estates subject to guardianship.** All minors, incompetents and spendthrifts are subject to guardianship. The court may appoint a guardian of the person of anyone subject to guardianship who is also a resident of the county, or of a nonresident found in the county, under extraordinary circumstances requiring medical aid or the prevention of harm to his person or property found in the county. The court may appoint a guardian of the estate of anyone subject to guardianship, whether a resident of the state or not, if any of the estate is located within the county. Separate guardians of the person and of the estate of a ward may be appointed."

[3] "880.15. **Temporary guardian.** (1) APPOINTMENT. If the court finds that the welfare of a minor, spendthrift or an incompetent requires the immediate appointment of a guardian of the person or of the estate, or of both, it may, with or without notice, appoint a temporary guardian for a period not to exceed 60 days unless further extended by order of the court. The authority of the temporary guardian may be limited to the performance of duties respecting specific property, or to the performance of particular acts, as stated in the order of appointment. All provisions of the statutes concerning the powers and duties of guardians shall apply to temporary guardians except as limited by the order of appointment. The temporary guardian shall make such reports as the court directs, and shall account to the court upon termination of authority. The court assigned to exercise jurisdiction under ch. 48 has exclusive jurisdiction over the appointment of a temporary guardian of a minor for medical purposes but shall proceed in accordance with this section. No appeal may be taken from the order of appointment of a temporary guardian."

that the appellant (Mrs. R.) had failed to provide care, maintenance and support for J.L.W., and that such care had been provided by Mr. and Mrs. B. On May 22, 1980, the court appointed Mr. & Mrs. B. as temporary guardians for J.L.W. for a period not to exceed sixty days. The court also appointed Scott Cassidy as guardian *ad litem* for J.L.W.[4]

On July 2, 1980, Mr. and Mrs. B. filed a petition, pursuant to sec. 48.41, Stats. 1977,[5] to terminate the parental rights of Mrs. R. The petition alleged that Mrs. R. had abandoned J.L.W.; that she totally, substantially, continuously and repeatedly refused or neglected to provide J.L.W. with parental care, protection, maintenance and support; and that she totally, substantially and continuously neglected to provide J.L.W. with subsistence, education and other care although she was financially able to do so. The court appointed Scott Cassidy and Richard P. McGuire as co-guardians *ad litem* to represent J.L.W. in the termination proceedings.

The court, on July 3, 1980, ordered that the petitions for guardianship and termination of parental rights be joined and scheduled the matter for expedited jury trial. The court appointed Doctor Itzhak Matusiak, a psychologist, to examine Mr. and Mrs. B. and J.L.W.

---

[4] Richard McGuire was appointed co-guardian *ad litem* on July 3, 1980.

[5] "48.41. **Jurisdiction and venue for termination of parental rights.** The court has jurisdiction to terminate parental rights if the minor is within the state or as otherwise allowed under s. 822.03. If a court has made an order under s. 48.34 or 48.355 transferring legal custody of the minor, that court shall hear the termination of parental rights proceeding unless it transfers the proceeding along with all appropriate records to the county where the minor or parents are. Otherwise venue for the proceeding is in the county either where the minor is or where the parents whose rights are being terminated are." (*See* amendments enacted in Chs. 300 and 330, Laws of 1979.)

Mrs. R., by her counsel, made pre-trial motions to vacate the temporary guardianship of Mr. and Mrs. B. and to dismiss the petition to terminate Mrs. R.'s parental rights. Both motions were denied by the trial court.

A jury trial was held on July 24, 25 and 28, 1980, on the petition to terminate Mrs. R.'s parental rights.

The evidence adduced at trial portrays a painful family conflict involving a two-year old child, his mother, his aunt and uncle and his grandmother. The child's mother, Mrs. R., was a thirty-four year old, divorced mother of two teen-aged children when J.L.W. was conceived in 1978. At that time Mrs. R. was employed as a registered nurse in a Boston area hospital. Mrs. R. testified that the father of the child was Dr. J., with whom she had had a relationship for several years.[6]

According to Mrs. R.'s testimony, Dr. J. pressured her to have an abortion upon learning that she was pregnant, saying if she did not, he would never see her again. Other hospital colleagues also advised her to have an abortion. Mrs. R. then sought guidance from the "Birthright" agency, where she was encouraged not to have an abortion, but to place the child for adoption. She decided not to have an abortion but was dissatisfied with the adoption alternative. She testified that:

"The idea of letting strangers adopt my child was completely repulsive to me. I just could not handle even the thought of it and that is when my family entered the picture because the whole time this counselor that was advising me was painting me pictures of childless couples and how desperate people were for children and all of a sudden I realized here in my own family there is in fact a couple that very much wants a child. My own sister. And it was the evolution through all these conversations

---

[6] On December 18, 1980, the trial court, by order, terminated the parental rights of Dr. J. and of any unknown person who may be the father of J.L.W.

that it occurred to me that maybe my sister and her husband would like to adopt my child . . ."

In June of 1978, Mrs. R. called her sister, Mrs. B., in Milwaukee, told her she was pregnant and wished that her sister and her husband would adopt the child after it was born. Mrs. B. testified that she and her husband discussed the idea and agreed to the proposal because they wanted to help Mrs. R.

Mrs. R. took a leave-of-absence from her nursing job, and moved to Milwaukee in August of 1978.[7] She enrolled her two children in the Milwaukee public schools and rented an apartment. Mr. and Mrs. B. and Mrs. R. then prepared a nursery for the child in Mr. and Mrs. B.'s home. Some of the nursery furnishings were provided by Mrs. R., some by Mr. and Mrs. B.

During the fall, while carrying the child, Mrs. R. began to feel misgivings about going through with the adoption. She testified that she "did not see how I was ever going to go through with it" and that she "wanted that child very much as I always had . . . it was very painful to go over to their house and see them prepare for my child. It was extremely painful."

Mrs. R. testified that she expressed her misgivings about giving up the child in a conversation with Mrs. B. in November. According to Mrs. R., her sister told her she should think in terms of the child dying, that she would have to go through a period of mourning and once she got through that she would be able to cope with the loss. Mrs. R. considered that remark insensitive and the conversation proceeded no further.

The child was born on January 12, 1979, and was named in a joint effort by Mrs. B. and Mrs. R.

---

[7] Mrs. R. testified she left Boston several months before the baby was due because she was under great emotional stress working side-by-side with Dr. J. in operating room settings.

After the birth, Mrs. R. testified, she definitely changed her mind about giving up her child. She described her experience watching people visiting J.L.W. as "horrendous." However, because she felt she had no other choice, she returned with J.L.W. to Mr. and Mrs. B.'s home after release from the hospital.

During the month following J. L. W.'s birth, Mrs. R. lived with J.L.W. alternately at her own apartment and at Mr. and Mrs. B.'s home. Although Mrs. R. did not then specifically tell her sister she had changed her mind, she testified that she and Mr. and Mrs. B. knew she did not want to go through with the adoption.

During this period Mr. and Mrs. B. told Mrs. R. they could not have children of their own; that they had been rejected by adoption agencies because they were too old; and that J.L.W. was their "last chance." Mrs. R. testified, recalling this conversation, that: "It totally destroyed me that I was ruining it for them."

Without resolving the issue, Mrs. R. returned to Boston on February 12, to resume her job, leaving her two grown children and J.L.W. in Milwaukee. She testified that she returned to her job at that time because she was totally out of money. She rejected borrowing money, especially from anyone in her family. She also wanted to get away from her mother and sister.

Her mother lived adjacent to Mr. and Mrs. B. in a duplex apartment home. Mrs. R. testified that, every time J.L.W. was discussed, her mother repeated her view that Mrs. R. was not financially capable of caring for J.L.W. and that he would be "better off" with Mr. and Mrs. B. Mrs. R. also decided against remaining in Milwaukee permanently. She testified Mr. and Mrs. B. knew she was planning to return and take J.L.W. to Boston with her.

Two weeks later, on February 26, 1979, Mrs. R. flew to Milwaukee, picked up J.L.W. and returned to Boston.

Mr. & Mrs. B. according to their testimony accepted her decision.

J.L.W. and Mrs. R. stayed for about a month with each of two friends of hers in Boston. J.L.W. was taken to a babysitter while Mrs. R. worked at the hospital. She was also trying to locate a suitable apartment, but had difficulty finding a place that would accept children.

On May 4, 1979, Mrs. R. again called her sister. At trial she testified she was then very depressed and "beaten" and was crying. She told her sister she was having "an incredible time trying to find a place to live," and that she simply couldn't handle J.L.W. as a single working parent. She then asked her sister if she would consider "taking J.L.W. back."

Mrs. B. testified that she responded that she and her husband considered J.L.W.'s return to Mrs. R. at the end of February to have been final and would agree to accept J.L.W. only if they could be assured of keeping him as their son. Mrs. B. testified that her sister then promised to agree to a termination of her parental rights.

Mrs. R.'s testimony concerning that call was somewhat different. She stated at trial that she had an impossible time trying to cope during the eight weeks in Boston. She was living in the homes of friends; delivering J.L.W. to a babysitter early in the morning where he would remain while she worked until late in the afternoon; looking for an apartment; shopping and caring for J.L.W. She testified she "was beginning to think that what everyone was telling me was probably true—that he was better off with them." She considered J.L.W.'s return to Mr. and Mrs. B. an opportunity to have some "breathing room" so she could "get her act together." If she could not do that, she would reconsider adoption. Mrs. R. denied ever discussing termination of her parental rights or even using that phrase.

Two days after that phone call, Mrs. R. flew to Milwaukee with J.L.W. She handed J.L.W. to Mrs. B. at the airport, told her to "love and enjoy him" and immediately returned to Boston. Upon her return, Mrs. R. stayed with friends for a few weeks and then moved into a studio apartment for the summer.

In June 1979, Mrs. R. flew to Milwaukee and returned to Boston with her daughter and personal possessions in a rented truck. Her older son returned to Boston later that month. Mrs. R. testified that she did not take J.L.W. with her at that time because she was concerned that she might be stranded on the road due to the shortage of gasoline at that time.

Although Mrs. R. did speak with her sister during the weeks following J.L.W.'s return to Milwaukee, she did not discuss J.L.W. because according to Mrs. R.'s testimony, the tension between the sisters made the subject too painful for her to broach.

During the summer, Mrs. R. was offered a new job in Washington, D. C. She testified that she verbally committed herself to accepting the job and hoped to begin a new life there with her family, including J.L.W. She stated at trial that she located an apartment in Washington; investigated schools for her older children and day care facilities for J.L.W. On August 18, 1979, she sent a letter to her sister explaining that she could not live with the loss of her son and would pick him up in Milwaukee the following weekend.[8]

---

[8] Relevant portions of Mrs. R.'s letter are set out below:

"It is with much pain and difficulty that I force myself to write this letter to you. I have not communicated with you since I last saw you in June for obvious reasons—I cannot cope or deal with this whole situation. I have been unbearably miserable and depressed. . . .

"I am continually haunted by the look on [J.L.W.'s] face as you walked away from me with him at the airport. I am also torment-

Mrs. B. testified that, although "deeply hurt" by her sister's change of mind, she and her husband were willing to comply with Mrs. R.'s wishes.

ed by a vision I have of him several years old asking, 'Why didn't my mother want me?' If I hadn't wanted him, I would have had an abortion last summer. So, why isn't he with me now? If you weren't in the picture, he would be with me. I keep thinking of other situations that could have existed and what would I have done. For example, what if [Dr. J] and I had been together, married or otherwise, while I was carrying [J.L.W.] and [Dr. J] died or something happened to him. Would I have considered giving up [J.L.W.]? No. Every situation I think of, the answer is the same—NO. I continually make lists of reasons pro and con for you having [J.L.W.] and which is better for [J.L.W.]. The list for him to be with me is longer. When it comes down to the actual reasons why he is there with you instead of with me, it is for the wrong reasons: 1) materialistic ones and 2) I feel sorry for you because you don't have a child. Neither of which are the right reasons for going thru with an adoption. I don't know whatever possessed me last summer to ever think I could give my child up; I would never even consider giving him up to strangers, but how did I rationalize giving him up to you? Again, for materialistic reasons because I didn't see how I could raise him by myself. There are more women much worse off than me who do it and manage.

"I have to get my family together and start over. My family is [S], [J] and [J.L.W.]. They are all I have. They depend on me and I am responsible for them . . . it is not my fault nor my doing that you don't have children—why did I ever think I could come up with the solution for your problem? I cannot rectify your situation at my own emotional and psychological expense as well as [J.L.W.'s]. He belongs with his natural mother as any child does and when at all possible. He also belongs with his own brother and sister who also love him and miss him very much.

"The other thing that makes me so angry when I think about it, is that not once have any of you (including mother) done anything to help me in any way so that I could keep my son. Not even a word of encouragement or moral support. When I asked you back in May to take [J.L.W.] back because I could not find a place to live even, you should have said that you would until I got back on my feet or got settled or something. I was so overwhelmed by trying to make ends meet, find a place, etc. that I did not

Mrs. R.'s expected visit did not occur however, because two days after mailing the letter Mrs. R. had an automobile accident. She was not seriously injured but was hospitalized and her car was extensively damaged. She testified at trial that the accident "absolutely devastated" her. She said she felt she was just getting her life back into control and had taken a long step forward when the accident pushed her "twenty-five steps back." Her car was repaired over the next month while Mrs. R. used a rental car. Mrs. R. called her sister to inform her of the accident.

Because her rented car was not in good condition, she felt it was not feasible to travel to Washington and cancelled her plans to move there.

It was not until April of 1980 that Mrs. R. returned to Milwaukee again. She explained this delay at trial,

ever see how I would manage to give [J.L.W.] a home not to mention [S] and [J]. Instead of encouraging me, you were right there to take [J.L.W.], never mind what I might be going thru . . . .

"I am driving out there next weekend to pick him up. I will also get a trailer and take the rest of my things from the garage. Please have his clothes and things packed in boxes and ready by Saturday. I do not plan or want to stay there any longer than is necessary to get the things from the garage and put [J.L.W.'s] things in the car. It will be painful and emotionally traumatic for us all so the less said, the better. I do not want to take anything with him that is yours and that you got for him unless you want him to have it. The only thing I want is a record of any visits to a pediatrician and any immunizations he has had while he has been there. I will reimburse you for the costs of that as well and any other expenses you have incurred while he was staying there with you.

". . . not a day has gone by without [J.L.W.], that something or someone tells me to go and get my son, that he belongs with me, that he is waiting for me to come and get him. Who? I have tried to cope without him, tried to accept it, tried to forget him. But something won't let me rest, won't let me alone; haunted, tormented, tortured—those are the words for the way I feel." [signed Mrs. R.]

stating that she had to establish a home in Boston, and repay money she had borrowed to repair her car and because she was apprehensive about the show-down with her sister. She felt she could wait because she knew "J.L.W. was safe, well cared for and being loved." She testified she wanted to "gather strength" to prepare to recover J.L.W.

The April visit was not expected by Mr. and Mrs. B. Mrs. B. characterized the visit as "unannounced and uninvited." According to Mrs. B., she, her mother and J.L.W. were in front of Mr. and Mrs. B.'s home on a Friday afternoon, when Mrs. R. appeared on the sidewalk. Because she had heard nothing from her sister since the August letter Mrs. B. felt threatened. As she testified: "I regarded J.L.W. as my baby and I was prepared to take whatever steps I had to prevent" Mrs. R. from taking J.L.W. away.

Mrs. R. remained in Milwaukee until late Saturday afternoon, but it was not a harmonious reunion. Mrs. R. testified she was permitted to visit J.L.W. for three hours on Friday night, but only after she threatened to break down Mr. and Mrs. B.'s door. On Saturday, she left for Boston in the late afternoon without seeing J.L.W. Mrs. B. testified that she, her husband and J.L.W. left at 9:30 that morning to run some errands. When they returned two hours later, Mrs. R. was herself away on an errand. Mrs. B. testified she thought Mrs. R. was leaving for Boston at noon, so they stayed at home until mid-afternoon, when they left for a social engagement. Mrs. R. left Milwaukee before they returned. Mrs. R. testified she was "outraged" that they had left before she could say goodbye to J.L.W. She testified that she had to leave when she did in order to return to Boston in time for work. Just before her departure, she had a confrontation with her mother. According to Mrs. R.'s testimony, her mother repeated her opinion that J.L.W. was

better off with Mr. and Mrs. B. Mrs. R. testified that she then shouted: "I'm coming back for my son and you tell them that."

The next contact between the parties was a letter written by Mrs. B. to her sister on May 22, 1980. In her letter, Mrs. B. explained that she and her husband were concerned over the fact that no one in Milwaukee had legal authority to act on J.L.W.'s behalf, particularly if he were to require medical treatment. She informed Mrs. R. that she and her husband decided to petition the Milwaukee Children's Court for appointment as J.L.W.'s guardians.

At the close of evidence, in this first phase of the trial, the jury was instructed on the grounds alleged for termination of Mrs. R.'s parental rights.[9] On a special verdict, the jury found that Mrs. R. had: (1) abandoned J.L.W., (2) refused to provide for J.L.W., (3) neglected to provide for J.L.W., and (4) although financially able, neglected to provide for J.L.W.

Under the statutory scheme, any of these findings was sufficient to permit the court to terminate Mrs. R.'s

---

[9] "48.40. **Grounds for termination of parental rights.** The court may, upon petition, terminate all rights of parents to a minor in any of the following cases: . . .

"(2) If it finds that one or more of the following conditions exist:

"(a) That the parents have abandoned the minor; or

"(b) That the parents have substantially or continuously or repeatedly refused or neglected or are unable for a prolonged indeterminate period to give the minor the parental care and protection necessary for his health, morals or well-being; or

"(c) That, although the parents are financially able, they have substantially and continuously neglected to provide the minor with necessary subsistence, education or other care necessary for his health or well-being or have neglected to pay for such subsistence, education or other care when legal custody is lodged with others; or . . ." (Repealed and recreated by Ch. 330, Laws of 1979).

parental rights to J.L.W.,[10] although the existence of statutory grounds does not require the court to terminate. Rather, the trial court "must consider all the circumstances and exercise its sound discretion as to whether termination would promote the best interests of the child." *In re Johnson*, 9 Wis.2d 65, 75, 100 N.W.2d 383 (1960) ; *Termination Of Parental Rights Of Kegal*, 85 Wis.2d 574, 271 N.W.2d 114 (1978).

Accordingly, the trial court conducted further proceedings on August 5 and 20 to determine the best interests of J.L.W. The court received testimony in this second phase of the proceedings from Mr. and Mrs. B., Mrs. R., a court-appointed clinical psychologist, and a child psychologist and a child psychiatrist called as expert witnesses by Mr. and Mrs. B. J.L.W.'s guardian *ad litem* participated in these proceedings and filed a written report recommending termination of Mrs. R.'s parental rights to J.L.W.

After considering the testimony and the report of the guardian *ad litem*, the court entered an order on October 2, 1980, terminating Mrs. R.'s parental rights. Judgment was entered on October 29, 1980.[11]

---

[10] "48.43. **Disposition of proceeding to terminate parental rights.** (1) If, after a hearing, the court finds that one or more of the conditions set out in s. 48.40 exist, it may terminate parental rights. If the court terminates parental rights of both parents, or of the only living parent, the court shall transfer guardianship and legal custody of the minor to:

"(a) A county department of social services in counties having a population of 500,000 or more; or

"(am) A county department of public welfare; or

"(b) A child welfare agency licensed to accept guardianship of children; or

"(c) The department; or

"(d) A suitable individual in whose home the minor has resided at least one year prior to the termination of parental rights." (Repealed and recreated by Ch. 330, Laws of 1979).

[11] On October 31, 1980, the court extended Mr. and Mrs. B. temporary guardianship for a period not to exceed sixty days. Ac-

Mrs. R. filed a notice of appeal from the whole order and judgment on December 1, 1980. On January 20, 1981, this court granted Mrs. R.'s motion to bypass the court of appeals and advanced the case for oral argument during the April 1981 assignment of cases.

As stated at the outset, we consider the primary question raised on appeal to be whether Mrs. R.'s parental rights could be terminated without a finding that she is an unfit parent?

We conclude that under the facts of this case, termination denied Mrs. R. her constitutionally protected rights to the care, custody and management of J.L.W.

The integrity of the family has been deemed subject to constitutional protection through the due process clause of the Fourteenth Amendment to the United States Constitution. The supreme court has recognized that the protection of due process protected by the Fourteenth Amendment's "liberty" guarantee cannot be reduced to mere formula. In Mr. Justice Harlan's words:

" '. . . [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, . . . and which also recognizes what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.' *Poe v. Ullman, supra,* at 542–543 (dissenting opinion)." *Moore v. City Of East Cleveland, Ohio,* 431 U.S. 494, 502 (1977).

cording to the respondent's brief, on December 18, 1980, the court awarded legal custody and guardianship of J.L.W. to Mr. and Mrs. B.

Of course, protection of the sanctity of the family, does not mean that a state lacks "constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Parham v. J.R.*, 442 U.S. 584, 603 (1979). It does mean, however, that a parent's interest in the custody of a child is ". . . cognizable and substantial." *Stanley v. Illinois*, 405 U.S. 645, 652, (1972).

In *Stanley*, an unwed father challenged an Illinois statutory scheme permitting the parental rights of unwed fathers to be terminated without a determination of his parental fitness. The Illinois law required a finding of unfitness before the rights of a married parent could be terminated. The supreme court concluded that:

". . . as a matter of due process of law, Stanley was entitled to a hearing on his fitness as a parent before his children were taken from him. . . ." *Stanley v. Illinois, supra*, 405 U.S. at 649.

In *Stanley*, the unwed father had lived with his children and their mother as a part of the family unit.

In *Quilloin v. Walcott*, 434 U.S. 246 (1978), a similar challenge was brought against Georgia statutes providing generally that:

". . . a child born in wedlock cannot be adopted without the consent of each living parent who has not voluntarily surrendered rights in the child or been adjudicated an unfit parent.

"Even where the child's parents are divorced or separated at the time of the adoption proceedings, either parent may veto the adoption. In contrast, only the consent of the mother is required for adoption of an illegitimate child." *Quilloin, supra*, 434 U.S. at 248.

Unlike *Stanley*, the unwed father in *Quilloin* had never been a *de facto* member of his child's family. Rather, the child had been in the custody of his mother throughout his life. The mother had married when the child was three and the child and his mother and stepfather had lived as a family ever since. The father had never

sought custody or legitimation nor had he objected to the child continuing to live with its mother and stepfather. Nine years after the mother's marriage, she consented to her husband's adopting the child. The child's father objected to the husband's petition for adoption.

Relying on *Stanley,* the unwed father in *Quilloin,* argued that he was entitled to an absolute veto over the adoption of his child as a matter of due process and equal protection.

The United States Supreme Court, in ruling against the natural father, said:

"We have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.' *Smith v. Organization Of Foster Families,* 431 U.S. 816, 862–863 (1977), (Stewart, J., concurring in judgment). But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except appellant. Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, were in the 'best interests of the child.' " *Quilloin, supra,* 434 at 255.

Mr. and Mrs. B., by their counsel, argue that Mrs. R., like the father in *Quilloin* has no fundamental right to family integrity. This is so, they contend, because Mrs. R. never formed a family unit with J.L.W.

Mrs. R., on the other hand, argues that *Stanley* controls and her parental rights could not be terminated absent a finding of unfitness.

We agree that, under the facts presented in this case, Mrs. R. had to be found unfit as a mother before her parental rights to J.L.W. could be terminated. Unlike the father in *Quilloin,* Mrs. R. had legal custody of J.L.W. until the court ordered otherwise. Sec. 48.425 (6n) (a), Stats. 1977, provides:

"**48.425. Hearings and findings.** . . . (6n) (a). The natural mother shall have legal custody of a child born out of wedlock and not subsequently legitimated or adopted, unless legal custody is transferred to another under s. 48.355 or 48.43 or the natural father is granted legal custody under par. (b) or sub. (2n)."

Mr. and Mrs. B., by their letter requesting Mrs. R.'s consent to their guardianship, acknowledged her legal custody to J.L.W. In addition, she had physical custody of J.L.W. during most of the child's first four months of life.

Finally, *Quilloin* is distinguishable because the child's existing "family unit" included his natural mother.

In *Smith v. Organization Of Foster Families,* 431 U.S. 816, 842–843 (1977), the supreme court discussed the meaning of "family" for purposes of the due process clause. Although the court acknowledged "considerable difficulty," in defining "family," it recognized certain guides to elements of the definition:

"First, the usual understanding of 'family' implies biological relationships, and most decisions treating the relation between parent and child have stressed this element. *Stanley v. Illinois,* 405 U.S. 645, 651 (1972), for example, spoke of '[t]he rights to conceive and to raise one's children' as essential rights, citing *Meyer v. Nebraska,* 262 U.S. 390 (1923). *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535 (1942). And *Prince v. Massachusetts,* stated:

" 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for

obligations the state can neither supply nor hinder.' 321 U.S. at 166." *Smith, supra,* 431 at 843.

The court, in *Smith* recognized that foster families may have a similar liberty interest in the integrity of the family unit.[12] But the court continued:

"Whatever liberty interest might otherwise exist in the foster family as an institution, that interest must be substantially attenuated where the proposed removal from the foster family is to return the child to his natural parents." *Smith, supra,* 431 U.S. at 846–847.

In *Ponsford v. Crute,* 56 Wis.2d 407, 413, 202 N.W.2d 5 (1972), this court held that a natural father "cannot be deprived of the custody of his minor child unless there is a finding that he is either unfit or unable to care for the child."

In *La Chapell v. Mawhinney,* 66 Wis.2d 679, 683, 225 N.W.2d 501 (1975), the court held that the rule stated in *Ponsford* was not inflexible and should not be interpreted as requiring that "in every case involving a dispute between the natural father or mother and grandparents for the custody of the children, the doctrine of the best interests of the children cannot prevail." In a concurring opinion, joined by a second member of the court, it was stated that the record in *La Chapell* conclusively showed the father to be an unfit parent.

We hold that, except under unusual circumstances like those presented in *Quilloin,* the due process protections of the State and Federal Constitutions prohibit the termination of a natural parent's rights, unless the parent is unfit.

---

[12] Mr. and Mrs. B., of course, are not technically a "foster family," although their relationship to J.L.W. is analagous to a foster family. In this appeal, Mr. and Mrs. B. do not argue that they have a cognizant liberty interest in J.L.W.'s custody.

In this case, no finding was made that Mrs. R. was an unfit parent, nor could such a finding be sustained on this record. All of Mrs. R.'s actions from the time she learned of her pregnancy showed a concern for the child she was to bear. She turned aside the threats of relationship termination by the child's father and refused to have an abortion. She bore the child and tried to keep him with her in spite of financial and career costs to herself and the disruption of the lives of her two teen aged children. She never did contemplate allowing "strangers" to have her baby. Rather, she turned to her own family, her sister and her mother, for help. They responded and she knew her child would be taken care of by her family until she could re-establish her career and a home for all of her children. Faced with responsibilities to her other children and limited resources, it is not hard to understand how, at times, she contemplated letting her son be raised by her sister and brother-in-law. But when it reached a point where family help became a demand that she transfer legal custody to her sister and brother-in-law and allow her parental rights to be permanently terminated, she fought back with a natural mother's instinct to protect her own. While her actions may have constituted statutory grounds for termination, they do not demonstrate her unfitness as a parent.

The report of the court-appointed psychologist, Dr. Itzhak Matusiak, states that analysis of Mrs. R. reflects:

". . . an intellectually competent individual who exhibited a pattern of general strengths, as even the relative weaknesses exhibited in testing were well within the average range. [Mrs. R.'s] abilities in areas that pertain to the *application of practical judgment* and *abstract reasoning were near the uppermost levels of measurement and she appeared to be capable of being an effective*

*problem solver who is able to accurately decipher her environment and deal with it in an appropriate manner.*

"Present personality indices were reflective of an individual who, despite her current tense state, appears to be quite capable of interacting in a friendly, engaging, and open manner. [Mrs. R.] exhibited a good sense of humor and appropriate social skills and she showed little evidence of being unduly secretive, guarding, or withholding. Through the interview and in testing it was evident that [Mrs. R.'s] overall approach was one of concern for [J.L.W.'s] welfare and psychological well being. However, although expressing gratitude for the warmth, enrichment, and support made available to her son within [Mr. and Mrs. B.'s] home environment, [Mrs. R.] vehemently rejected the notion that she was somehow either unmotivated, unprepared, or unable to provide an appropriate developmental setting for her own child. Indeed, given the background information concerning [Mrs. R.'s] two older children, . . . and the direct observations and test findings obtained by this psychologist in [her daughter's] evaluation, *it is felt here that the mother's parenting abilities appear to be of a proven quality,* especially in view of the difficult circumstances experienced by her while raising these two children." (Emphasis added.)

Dr. Matusiak concluded:

"There seems little doubt that [Mrs. R.] *is an effective authority figure who would present a good developmental model to [J.L.W.] and is well suited to meet his needs for nurturance, succorance, and dependence. She seems quite motivated to fulfill her son's needs and presents a fully adequate and appropriate plan for doing so.* Although this psychologist is fully aware of the potential disruptive consequences of an interruption in the continuity of [J.L.W.'s] current developmental environment, it is felt here that, given his personality structure and coping abilities, he would be able to successfully deal with the difficulties associated with his transfer to his biological mother's home environment. At the same time, it is felt here that although the mother's actions with regard to [J.L.W.] may have given the appearance of abandonment, *it is this psychologist's impression that her loyalty*

*to the child was never in question.* Rather, she appears to have been unable to assert her maternal claim to the child due to factors associated with the insecurities and unresolved inner conflict experienced by her at the time. Consequently, due to [J.L.W.'s] apparent emotional stability and adaptability, [Mrs. R.'s] readiness to provide for her child's developmental needs and her evident ability to do so, it is recommended that [Mrs. R.'s] parental rights not be terminated at this time and that a procedure be developed for [J.L.W.'s] orderly transfer to his mother." (Emphasis added.)

Mr. and Mrs. B.'s first expert witness was Dr. Maria Piers, a child psychologist. She interviewed Mr. and Mrs. B. with J.L.W. and considered their relationship very good. She considered the two parent family they provided superior to the single parent situation that would exist if J.L.W. was left with his natural mother. She also gave the opinion that it would be psychologically damaging to J.L.W. to be separated from Mr. and Mrs. B.

Mr. and Mrs. B's second witness was H. David Sackin, M.D., a child psychiatrist. He interviewed none of the parties but opined on the negative psychological effect of J.L.W.'s leaving Mr. and Mrs. B.

The trial court, in its memorandum decision, said:

"Dr. Sackin indicated that he, like Dr. Piers, was a hardline believer in the theory that, once established, the parent-child psychological bond should be considered inviolate."

Such a statement would appear to be a gross oversimplification.

The trial court, in its memorandum decision, concluded these experts were right and that: "Failure to terminate would result in [J.L.W.'s] removal from a happy, warm, comforting and secure two-parent environment where he is cared for by a mother at home to a home of less stability where he will be in a day care center most of the day . . ."

The latter is, of course, the way of life for an ever increasing number of mothers who are either single parents or working wives. It does not show that such a mother is unfit.

Since the record provides no basis for finding Mrs. R. to be an unfit parent, we reverse the orders terminating her parental rights to J.L.W. and granting temporary guardianship to Mr. and Mrs. B. Mrs. R's parental rights to her son J.L.W. are reinstated.

Mrs. R. has also argued in this appeal that sec. 48.40 (2) (a), (b) and (c) are unconstitutionally vague; that the termination petition failed to provide adequate jurisdictional allegations and notice of the conduct to be considered as the basis for termination; that the evidence of the grounds for termination and of the best interests of J.L.W. was insufficient; and that sec. 48.09(6), Stats. 1977,[13] requires that the interests of the public be represented in termination proceedings. In view of our disposition of this case on constitutional grounds and the amendments to the termination statutes,[14] it is unnecessary for us to determine these issues.

*By the Court.*—The orders and judgment of the trial court terminating the parental rights of Mrs. R. to J.L.W. and granting guardianship to Mr. and Mrs. B. are reversed. *J.L.W. is to be returned to Mrs. R.*

---

[13] "48.09. **Representation of the interests of the public.** The interests of the public shall be represented in proceedings under this chapter as follows: . . . (6) By any appropriate person designated by the county board in any matter arising under s. 48.14."

[14] See ch. 330, Laws of 1979.