IN RE the TERMINATION OF PARENTAL RIGHTS TO ERIN R.S., a Person Under the Age of 18:

STATE of Wisconsin, Petitioner-Respondent,

v.

KELLY S., Respondent-Appellant.†

Court of Appeals

*No. 01–0328. Submitted on briefs May 25, 2001.—Decided July 3, 2001.*

2001 WI App 193

(Also reported in 634 N.W.2d 120.)

† Petition to review denied 9-19-01.

On behalf of the respondent-appellant, the cause was submitted on the briefs of *John J. Grau* of *Grau Law Office* of Waukesha.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Christopher W. Stock*, district attorney of Fond du Lac County.

A nonparty brief was filed by Guardian ad Litem Catherine Flaten Jones of Fond du Lac for Erin R.S.

Before Brown, P.J., Nettesheim and Snyder, JJ.

¶ 1. BROWN, P.J. The parties and the trial court agree that the following statement is the law in Wisconsin: After a jury has found evidence supporting termination of parental rights, the trial court's duty is to determine whether such evidence was "egregious" such that termination should occur. *B.L.J. v. Polk County DSS*, 163 Wis. 2d 90, 103, 470 N.W.2d 914 (1991).[1] The dispute centers on how the "egregious analysis" is conducted. We agree with Kelly S., up to a point, that this is a two-part, sequential test. Our understanding of the law is that, first, the court must consider whether the unfitness is of such strength that it undermines the ability to parent. Second, if so, then the court considers whether that inability is seriously detrimental to the child. Kelly claims that the trial court's analysis here was flawed because it considered the second question in tandem and as part of the first question, rather than doing so sequentially. We hold that although the trial court erred in its belief that the

---

[1] This case has been cited as the *K.D.J.* case in some past appellate opinions and also by the name we use here, the *B.L.J.* case. In another section of this opinion, we refer to the *Mrs. R.* case. That case has also been referred to as the *J.L.W.* case. The confusion in how to cite the cases can be traced to the old citation rule which instructed the courts to use the name of the child in termination of parental rights cases. Now, under the new rule, we use the first adversarial party's name. But, to avoid confusion, we point out that *K.D.J.* and *B.L.J.* are one and the same. Likewise, *J.L.W.* and *Mrs. R.* refer to the same case. We use the new citation rule because, quite simply, it is now the rule.

146

law mandates the questions to be considered in tandem, a close reading of the court's disposition shows that the law was, in actuality, followed. We affirm.

¶ 2. Kelly is the biological mother of Erin R.S. A CHIPS petition was filed on August 14, 1997, and a disposition finding Erin to be in need of protection and services was eventually entered on December 10, 1997. The order was extended twice for one year. On March 17, 2000, a petition to terminate Kelly's parental rights was filed. The petition claimed abandonment. A jury found that Erin had been adjudged to be in need of protection and services and was placed outside the home for a cumulative total period of six months or longer pursuant to one or more court orders containing the termination of parental rights notice as required by law. The jury also found that reasonable efforts had been made to provide services ordered by the court and that Kelly had failed to meet the conditions established for the safe return of Erin to Kelly's home. The jury further found that there was a substantial likelihood that Kelly will not meet these conditions within the following twelve-month period. A disposition hearing ensued and the trial court, after consideration, terminated Kelly's parental rights. Thereafter, Kelly brought a motion to vacate the disposition on grounds that the court had misunderstood the legal standard established in *B.L.J.*, in evaluating Kelly's level of unfitness to parent. More precisely, Kelly alleged that the court had applied the wrong standard in determining whether her acts were egregious enough to warrant termination. The trial court denied the motion and Kelly then appealed to this court.

¶ 3. Since much of this case concerns what the law is, we will discuss this issue before getting into the

facts. In *B.L.J.*, the supreme court construed WIS. STAT. §§ 48.424 and 48.427(2) (1999–2000).[2] We set forth the first three sections of this statute for completeness purposes. But we pay special attention to the first two sentences of sec. (4) and all of § 48.427(2):

> **48.424 Fact-finding hearing. (1)** The purpose of the fact-finding hearing is to determine whether grounds exist for the termination of parental rights in those cases where the termination was contested at the hearing on the petition under s. 48.422.
>
> **(2)** The fact-finding hearing shall be conducted according to the procedure specified in s. 48.31 except that:
>
> (a) The court may exclude the child from the hearing; and
>
> (b) The hearing shall be closed to the public.
>
> **(3)** If the facts are determined by a jury, the jury may only decide whether any grounds for the termination of parental rights have been proven. The court shall decide what disposition is in the best interest of the child.
>
> **(4)** If grounds for the termination of parental rights are found by the court or jury, the court shall find the parent unfit. A finding of unfitness shall not preclude a dismissal of a petition under s. 48.427(2). . . .
>
> **48.427 Dispositions.**
>
> . . . .
>
> **(2)** The court may dismiss the petition if it finds that the evidence does not warrant the termination of parental rights.

[2] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

The *B.L.J.* court construed §§ 48.424(4) and 48.427(2), in pari materia, to say that although a jury may find the "facts" which would constitute "grounds" for termination, the legislature gives the trial court the ultimate power to determine whether termination should occur. *B.L.J.*, 163 Wis. 2d at 103–04. The supreme court wrote that even after a jury finding favorable to the government, the trial court may nonetheless dismiss the petition to terminate in two alternative ways. First, the trial court may find that the evidence is insufficient. Or, second, the trial court may determine that the evidence, even if sufficient, is not so "egregious" as to "warrant" termination. *Id.* The supreme court construed the legislature's use of the word "warrant" as evidence of a grant of authority to the trial court to make the final call concerning whether the parent's unfitness was egregious enough to merit termination.

¶ 4. The dispute between the parties centers on *how* the trial court is to make this call. The State, represented by the district attorney, points to a passage from the *B.L.J.* case in support of its belief that the trial court reaches the question of egregious conduct by considering three factors, all at the same time. These factors are the evidence, the findings of fact and the best interests of the child. The passage from *B.L.J.*, relied upon by the State, is as follows:

> Thus, it seems clear that in spite of what the evidence may show, whether such evidence warrants termination, is a matter within the discretion of the court. This is so because the word "warrant" implies an overview of the evidence, the findings, and also the implication of *what is in the best interest of the child.* (Emphasis added.)

*Id.* at 104. The trial court, in deciding a motion to vacate the TPR judgment, agreed with the State.

¶ 5. Kelly's argument is that this is a misapplication of what the supreme court was saying. According to Kelly, the egregious analysis consists of two phases and they are considered sequentially. First, according to Kelly, the court must consider whether the evidence was egregious. She takes this to mean that the court must consider whether, because of a parent's conduct, it is "essential to terminate" the parent's rights. Second, even if it is "essential" to terminate the parent's rights, the court must still decide whether it is in the child's best interest to terminate. Kelly maintains that, here, the court commingled the two functions in one and only decided whether it would be "better" that her rights to Erin be terminated.

¶ 6. We conclude that both sides are wrong. All we have to do to prove our point is detail what happened in the *B.L.J.* case and explain what the supreme court had to say about it. In *B.L.J.*, the mother had issues with chemical abuse. The facts were that the mother had been abusing alcohol for a long time. The child in that case was in foster care, returned to the mother, returned to foster care again, returned to the mother again, and then returned to foster care once more as the mother's inability to control her alcoholic impulses ebbed and flowed. Finally, having seen enough, the County petitioned for termination. At trial, the County presented evidence of attempts to help the mother overcome her problem, but to no avail. The jury found for the County and the trial court terminated parental rights.

¶ 7. On review before the supreme court, the court recalled an earlier case of the court, *Mrs. R. v. Mr. and Mrs. B.*, 102 Wis. 2d 118, 306 N.W.2d 46 (1981). The *B.L.J.* court explained that in *Mrs. R.*, the trial court, after jury findings, proceeded to determine "whether

the termination would promote the best interest of the child." *B.L.J.*, 163 Wis. 2d at 110 (citations omitted). The court reasoned that this " 'puts the cart before the horse.' Parental rights may only be terminated if the parent is unfit. Then a disposition looking to the best interest of the child takes place." *Id.* (citations omitted).

¶ 8. From the above passage, it is clear that consideration of the best interests, while a part of the analysis as to whether the parent's conduct is egregious enough to warrant termination, comes after a determination of unfitness by the trial court. So, to the extent that it is a two-part sequential test, we agree with Kelly and disagree with the State and the trial court. To say that best interests and a finding of serious unfitness are all part of one reasoning process does violence to *Mrs. R.*

¶ 9. But we part company with Kelly when we consider what the first test is. It is not, as Kelly claims, a question of whether her conduct was so bad that it was essential to terminate. That is really a meaningless test because it has no definition to it. Rather, in *B.L.J.*, the court zeroed in on what the first test is. Referring to the mother's conduct, the court wrote:

> It is clear from this record that the mother's parental rights were not terminated because she is an alcoholic but because of the effect her particular alcohol problem has on *her ability to function as a parent.*

*B.L.J.*, 163 Wis. 2d at 112 (emphasis added). From this passage, the first test becomes apparent. The trial court's function is to determine whether the parent's conduct undermines his or her ability to function as a parent. Some parental conduct may show that the parent is less fit than other parents, but if the ability to parent is not seriously affected by the conduct, then the

first test is not met. On the other hand, if the parental conduct is of such force that the ability to parent is compromised, then the first test has been met and the court moves to the second test, which is the best interests standard. And there, the question more precisely is whether the inability to function as a parent is so serious that further contact between the parent and child will be seriously detrimental to the child. *Id.* at 113.

¶ 10. The passage cited by the State and relied upon by the trial court at the hearing on the motion to vacate the judgment, which we quoted above, is not inconsistent with our understanding of *B.L.J.* The finding of whether such unfitness is egregious does in fact depend on the evidence, the findings and the best interests. We must not construe the language in that passage in a vacuum, but in the context of everything else that the supreme court wrote in *B.L.J.* We conclude that *B.L.J.* sets forth a two-part sequential test in determining whether the parent's unfitness was to such an egregious degree that it warranted termination. First, the trial court must answer whether the ability to function as a parent has been undermined. Second, if so, then the trial court must determine whether further contact between child and parent will be detrimental to the child.

¶ 11. It is true that the trial court did not frame its analysis in exactly the way the *B.L.J.* decision requires. But this does not necessarily mean, however, that we must reverse and remand for the trial court to do the analysis over. In fact, we use *B.L.J.* as authority for this point. There, the mother's counsel argued that there was no independent finding of parental unfitness and remand was appropriate. *Id.* at 109. The court disagreed. It wrote:

From the comments of the circuit court it is clear that the court was convinced her unfitness was sufficiently egregious to warrant termination. There would be no point in sending the case back to the circuit court for a specific, declaration to that effect . . . .

[T]he circuit court here made "unmistakable but implicit findings" of parental unfitness such as to warrant termination of parental rights.

*Id.*

¶ 12. We have reviewed the trial court's decision and conclude that the same result should obtain here. The trial court made unmistakable but implicit findings that Kelly's actions affected her ability to parent and that it was to such an extent that the child's safety and welfare would be seriously jeopardized by continuing the parent-child relationship.

¶ 13. Following are the chronological facts that the trial court had at its disposal when making its determination.

¶ 14. On July 5, 1995, Kelly was found intoxicated in a parking lot. She was sitting in the parking lot in dirt, gravel and glass. She was yelling and swearing. Erin was with her.

¶ 15. On June 22, 1997, Kelly received her third operating while under the influence violation. This included a penalty enhancer because there were three minors riding in the back of the pickup truck.

¶ 16. On June 25, 1997, Erin was removed from Kelly's home and placed with her maternal grandmother.

¶ 17. On July 25, 1997, Erin was returned to Kelly's home because of the grandmother's failing health and the difficulties she was having with Erin.

153

¶ 18. On August 27, 1997, Kelly was found to be operating while under the influence but was not charged or convicted. Erin was again moved to her grandmother's home. At this point, the CHIPS proceedings began and conditions were put in effect for Erin to return to Kelly's home.

¶ 19. As part of her treatment, a condition for the return of Erin, Kelly was to have regular drug screenings.

¶ 20. Sometime in 1997, Kelly was advised to not associate with Tom B., whom she had been living with, because of his past history with drugs, alcohol and crime. Kelly was unable to indicate for sure if Tom B. was using drugs or alcohol at the time. Kelly continued her relationship with Tom B., although she did not live with him.

¶ 21. In November 1998, Kelly tested positive for marijuana. Her individual counseling was discontinued at that time because she originally said that she had not been using drugs.

¶ 22. Kelly's group therapy was continued and urine samples were taken after these sessions.

¶ 23. On April 6, 1999, Kelly's urine test indicated an abnormally low level of creatine in the sample. The lab technician indicated that Kelly would have to drink gallons of water in order for the level to be that low. She also indicated that the sample was most likely diluted with something. Kelly tested negative for all drugs.

¶ 24. On May 12, 1999, Kelly tested positive for THC, the drug found in marijuana.

¶ 25. On November 23, 1999, Kelly tested positive for alcohol. Her alcohol level was .011%.

¶ 26. On April 18, 2000, Kelly again tested positive for marijuana. She also tested positive for nearly all the drugs tested for. This is very unusual; therefore a

confirmation test was run. It was determined that an interferant was present in the sample. It was not confirmed that THC was present, however, and a retest was recommended.

¶ 27. In June 2000, Kelly's group therapy was also discontinued. This was because she consistently was absent from the meetings and did not provide doctor's excuses for her absences.

¶ 28. On July 11, 2000, Kelly again tested positive for alcohol. Her alcohol level was .013%.

¶ 29. Furthermore, Lynn Klapperich, Kelly's drug and alcohol abuse counselor, felt that Kelly had been dishonest with her. Kelly told her that she was not using drugs or alcohol, but the urine sample tests still came back positive. Kelly did admit to using marijuana when Klapperich confronted her about it. Klapperich discontinued her individual counseling with Kelly because of this dishonesty.

¶ 30. Group therapy was also terminated because Kelly was consistently absent. Urine samples are taken after these meetings. Kelly began to be absent once she tested positive for drugs. Lab results indicated that Kelly may have tampered with her urine samples. The abnormally low creatine level in the April 6, 1999 test was most likely the result of the sample being diluted with something. Also, an interferant was found in the April 18, 2000 test, which invalidated the test results. Her counselor opined that Kelly tampered with the samples and occasionally spilled them on purpose.

¶ 31. Kelly was also dishonest with her psychologist. When asked how long she had been clean from drugs and alcohol, she said three and a half years. This statement was false.

¶ 32. Klapperich stated that all of the treatment options that the county can offer have been exhausted.

155

She opined that Kelly has not made progress in the ten years that she has been Kelly's counselor and that hope for progress in the future is very small. Klapperich noted that Kelly was unable to meet the conditions for Erin's return. She was originally given one year to complete the conditions. She was given two extensions and has yet to finish all of the conditions for Erin's return.

¶ 33. This case is remarkably like the facts in *B.L.J.* in that here, like the mother in *B.L.J.*, the county tried to help Kelly with her chemical abuse, but to no avail. Meanwhile, like the child in *B.L.J.*, Erin was bounced in and out of foster care such that there was no permanency in Erin's life. The trial court here alluded to the same concerns that the trial court alluded to in *B.L.J.* Basically, it came down to Kelly's failure to come to grips with her substance abuse problem. The trial court was concerned about Kelly's refusal to cooperate in a sustained and meaningful way despite attempts to help her cope. It was concerned about the instability existing in Erin's life as she bounced in and out of foster care. The trial court was obviously convinced that this evidence spoke to Kelly's inability to function as a parent. Thus, the trial court made implied findings consistent with the first test in the egregrious analysis.

■

¶ 34. As to the second test, our supreme court said in *B.L.J.*, "To condemn this child to go from foster home to foster home, waiting for a parental relationship to come into existence for which the mother seems unwilling to take steps to make possible, is, it seems to us, 'seriously detrimental to the child.' " *Id*. at 113 (citation omitted). The trial court made similar observations here. Thus, the second part of the test is met. We see no need to remand.

*By the Court.*—Order affirmed.

157